UNITED STATES DISTRICT COURT
NORTHERN DISRICT OF MISSISSIPPI
OXFORD DIVISION

| | |
|---|---|
| ANITA DANCY | Case No. 3:19cv167-MPM-RP |
| Plaintiff, | |
| v. | |
| MONSANTO COMPANY & JOHN DOE DEFENDANTS 1-5 | Jury Trial Demanded |
| Defendants. | |

## COMPLAINT

COMES NOW Plaintiff, Anita Dancy, through undersigned counsel, and hereby files this Complaint against the Defendants, Monsanto Company and John Doe Defendants 1-5, and the Plaintiff states as follows:

## INTRODUCTION

1.      Plaintiff, Anita Dancy, brings this action for damages and injuries sustained as a direct and proximate result of the Defendants' defective product, Roundup, and the Defendants' negligent and wrongful conduct with regard to the design, testing, manufacture, development, packaging, marketing, promotion, advertising, labeling, warning, distribution and sale of the herbicide Roundup.[1]

---

[1] "Roundup" refers to all formulations of Monsanto Company Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup

2.     Roundup is a herbicide spray used to kill weeds that commonly grow with crops and other plants.  The active ingredient in Roundup is glyphosate, which is now the world's most used herbicide.  In addition, Roundup also includes surfactant polyoxyethylene tallow amine (POEA) and/or adjuvants and other "inert" ingredients.

3.     Monsanto produces more glyphosate than any other company in the world.  Monsanto is also a leading producer of seeds for crops.  Most seeds sold in Mississippi and nationwide are "Roundup Ready," which are designed to be used in conjunction with Roundup.  The vast majority of soybeans and corn grown in Mississippi, for example, are Roundup Ready crops.

4.     Roundup's dominance of the agricultural market, particularly in Mississippi, has resulted in widespread dissemination of glyphosate into the air, rivers, lakes, rain and land.  Pursuant to findings by the US Geological Survey, the Mississippi Delta has extremely high concentrations of glyphosate in the air and rainwater.

5.     For approximately the past twenty (20) years, Anita Dancy has used the product Roundup multiple times per year to spray her 6.5 acres of land.  Said land contains goat fencing and cattle wire, which must be sprayed often with a weed killer.  Roundup is the product used by Anita Dancy and her husband to spray the fencing, in addition to other parts of the property such as the driveway, pasture and other grounds.

---

Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of Roundup containing the active ingredient glyphosate.

6.     At all times relevant to this Complaint, Anita Dancy was informed that the product Roundup was safe for use, and she was unaware of any warnings or precautions to be taken when using the product.  Until recently, no safety equipment was used or required for Roundup applications.

7.     As a result of the many years of direct exposure to Roundup, now 46-year-old Anita Dancy has developed and been diagnosed with B-cell non-Hodgkin's lymphoma.  She has no family history of non-Hodgkin's lymphoma.  This action is brought for the injuries and damages sustained by Anita Dancy as a result of his use of the product Roundup.


## PARTIES

8.     Plaintiff, Anita Dancy, is an adult resident citizen of Tate County, Mississippi.

9.     Defendant, Monsanto Company (hereinafter "Monsanto") is a foreign corporation organized and existing under the laws of Delaware, with its principal place of business at 800 North Lindberg Boulevard, St. Louis, Missouri 63167.  At all times relevant to this Complaint, Defendant conducted business in the State of Mississippi.  Defendant may be served with process via service upon its registered agent, Corporation Service Company, 7716 Old Canton Road, Suite C, Madison, MS 39110.


## JURISDICTION AND VENUE

10.     This Court has personal jurisdiction over Monsanto because Monsanto regularly conducts business in Mississippi and has sufficient minimum contacts in Mississippi.  Monsanto intentionally availed itself of this jurisdiction by marketing and selling products and services and by accepting and processing payments for those products and services within Mississippi.

Defendant further availed itself of jurisdiction in Mississippi by designing, manufacturing, testing, packaging, marketing, distributing, labeling and/or placing said products in the stream of commerce with the knowledge that said products would reach Mississippi.

11.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interests and costs, and this case is between citizens of different states.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this district and/or because Monsanto is subject to this Court's jurisdiction with respect to this action.

13.     Plaintiff was injured as a result of the defective Monsanto products at issue in this Complaint.  The product failures and the proximately resulting injury occurred while she was in or around Tate County, Mississippi, within the jurisdiction of the United States District Court for the Northern District of Mississippi, Oxford Division.  Jurisdiction and venue are appropriate in this Court.

**STATEMENT OF FACTS**

14.     At all times relevant to this Complaint, Defendant Monsanto was in the business of designing, manufacturing, researching, testing, advertising, promoting, marketing, selling and distributing its herbicide product Roundup.

15.     Defendant Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri.  It is the world's leading producer of glyphosate.

16.     Defendant discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based

4

"Roundup" as a broad-spectrum herbicide.

17.     Glyphosate is the active ingredient in Roundup.

18.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

19.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3 phosphate synthase, known as EPSP synthase.

20.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

21.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

22.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

23.     Defendant is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup, referred to as "Roundup Ready." As of 2009, Defendant was the world's leading producer of seeds designed to be Roundup Ready. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready seeds.

24.     The original Roundup, containing the active ingredient glyphosate, was

introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides.

25.     For nearly 40 years, consumers, farmers, and the public have used Roundup, unaware of its carcinogenic properties.

<u>MONSANTO'S MISREPRESENTATIONS THAT ROUNDUP IS SAFE</u>

26.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

(a)     Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

(b)     And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

(c)     Roundup biodegrades into naturally occurring elements.

(d)     Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

(e)     This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

6

(f)     You can apply Accord with "confidence because it will stay where you put it" [;] it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

(g)     Glyphosate is less toxic to rats than table salt following acute oral ingestion.

(h)     Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

(i)     You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

(j)     "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[2]

27.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

(a)     its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

(b)     its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

---

[2] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

(c)     its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

(d)     its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

(e)     glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

(f)     its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

28.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

29.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."

## ROUNDUP IS A CARCINOGIN

30.     As early as the 1980's, Monsanto was aware of glyphosate's carcinogenic properties.

31.     On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[3]  Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

---

[3] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection Agency.

32.     In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87 103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies.  All of the data required was submitted and reviewed and/or waived.

33.     In October 1991 the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[4]

34.     In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendant's Roundup products are more dangerous and toxic than glyphosate alone. As early as 1991, evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.

35.     In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

36.     The study found that Defendant's Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

37.     In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

38.     The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and

---

[4] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1881. United States Environmental Protection Agency.

human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."

39.     In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

40.     The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

41.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

42.     The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

43.     The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant.

44.     Defendant knew or should have known that Roundup is more toxic than

10

glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup.

45.     Defendant knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

46.     Defendant failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup.

47.     Rather than performing appropriate tests, Defendant relied upon flawed industry supported studies designed to protect Defendant's economic interests rather than Plaintiff and the consuming public.

48.     Despite its knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup as safe.

IARC CLASSIFICATION OF GLYPHOSATE

49.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

50.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015–2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

51.     IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of

11

significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

52.     On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendant's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Defendant's Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

53.     The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A probable carcinogen to humans. According to the authors glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

54.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

55.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

## 2019 STUDY ESTABLISHING LINK BETWEEN GLYPHOSATE & NHL

56.     A recently published study released March 18, 2019, in the International Journal of Epidemiology, establishes a clear link between Roundup and B-cell non-Hodgkin's lymphoma.[5]

57.     The study analyzes data from more than 300,000 farmers and agricultural workers in France, Norway, and the United States.  The study found "elevations in risks" of non-Hodgkin's lymphoma associated with glyphosate herbicides.

58.     The study found a clear link between glyphosate exposure and large B-cell lymphoma, the same type of cancer diagnosed in Plaintiff's case.

## EARLIER EVIDENCE OF GLYPHOSATE'S DANGER

59.     Despite the new classification by the IARC, Defendant has had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

60.     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

61.     In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

62.     The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

63.     Both human and animal studies have shown that glyphosate and glyphosate-based

---

[5] Maria E Leon, Leah H Schinasi, Pierre Lebailly, Laura E Beane, Freeman Karl-Christian Nordby, Gilles Ferro, Alain Monnereau Maartje, Brouwer Séverine, Tual Isabelle, Baldi Kristina Kjaerheim, Jonathan N Hofmann, Petter Kristensen, Stella Koutros, Kurt Straif, Hans Kromhout and Joachim Schüz, *Pesticide use and risk of non-Hodgkin lymphoid malignancies in agricultural cohorts from France, Norway and the USA: a pooled analysis from the AGRICOH consortium*, INTERNATIONAL JOURNAL OF EPIDEMIOLOGY (March 18, 2019), available at https://academic.oup.com/ije/advance-article/doi/10.1093/ije/dyz017/5382278.

formulations such as Roundup can induce oxidative stress.

64. Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

65. The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

66. In 2006 César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

67. The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

68. The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

69. Despite knowledge to the contrary, Defendant maintains that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

70. In addition to glyphosate and Roundup's genotoxic properties, Defendant has long been aware of glyphosate's carcinogenic properties.

71. Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

72. Defendant has known of this association since the early to mid-1980s and

14

numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

73.     In 1985, the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

74.     In 2003, Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

75.     The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3.11.

76.     In 2003, AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

77.     The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

78.     In 2008, Mikael Eriksson published a population based case-control study of exposure to various pesticides as a risk factor for NHL.

79.     This strengthened previous associations between glyphosate and NHL.

80.      In spite of this knowledge, Defendant continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

81.     Upon information and belief, Defendant's statements and representations have been made with the intent of inducing Plaintiff, the agricultural community, and the public at

15

large to purchase and increase the use of Roundup for Defendant's pecuniary gain, and in fact, did induce Plaintiff to use Roundup.

82.     Defendant made these statements with complete disregard and reckless indifference to the safety of Plaintiff and the general public.

83.     Notwithstanding Defendant's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

84.      Defendant knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

85.     Defendant failed to appropriately and adequately inform and warn Plaintiff of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

86.     Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendant continues to maintain that glyphosate and/or Roundup is safe, non carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

87.     Defendant has claimed and continue to claim that Roundup is safe, non carcinogenic, and non-genotoxic. These misrepresentations are consistent with Defendant's

16

cavalier approach to investigating and ensuring the safety of its products, the safety of the public at large, and the safety of Plaintiff.

<u>SCIENTIFIC FRAUD & SAFETY MISREPRESENTATIONS</u>

88.     After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), Monsanto exerted pressure upon the EPA to change its classification.  This culminated in the EPA's reclassification of glyphosate to Group E, which

was based upon evidence of non-carcinogenicity in humans.

89.     In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

90.     On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed scientific fraud.  In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to

perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup with the EPA.  In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

91.     Three top executives of IBT were convicted of fraud in 1983.

92.     In the second incident, Monsanto hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup.

93.     In March of 1991, the EPA announced that it was investigating Craven for "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides."

94.     The investigation resulted in the indictments of the laboratory owner and a handful of employees.

<u>MONSANTO'S CONTINUING DISREGARD FOR SAFETY</u>

95.     Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."

96.      Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

97.     Glyphosate, and Defendant's Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

98.     Defendant's statements proclaiming the safety of Roundup misled Plaintiff.

99.     Despite Defendant's knowledge that Roundup was associated with an elevated risk of developing cancer, Defendant's promotional campaigns focused on Roundup's purported "safety profile."

100.    Defendant's failure to adequately warn Plaintiff resulted in Plaintiff using and

18

being exposed to the product without taking appropriate safety measures. Defendant's failure to adequately warn also resulted in the Plaintiff using Roundup instead of another product. Defendant mislead the scientific and medical communities about the risks associated with glyphosate, which allowed Defendant to continue to conceal risks associated with Roundup.

101. Defendant failed to modify the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

102. The failure of Defendant to appropriately warn and inform the EPA resulted in inadequate warnings in safety information presented directly to users and consumers.

103. The failure of Defendant to appropriately warn and inform the EPA resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

104. The failure of Defendant to appropriately warn and inform the EPA resulted in the directions for use that are not adequate to protect health and the environment.

<u>PLAINTIFF'S EXPOSURE TO ROUNDUP</u>

105. Plaintiff began using Roundup approximately twenty (20) years ago.

106. Plaintiff sprayed Roundup on a regular basis for more than two (2) decades. Plaintiff used Roundup as intended.

107. During said period of time, Plaintiff has used the product Roundup multiple times per year to spray her 6.5 acres of land.

108. Said land contains goat fencing and cattle wire, which must be sprayed often with a weed killer. Roundup is the product used by Anita Dancy and her husband to spray the fencing, in addition to other parts of the property such as the driveway, pasture and other grounds.

19

109.    Plaintiff believed that Roundup was safe for ordinary use.

110.    In 2018, Plaintiff was diagnosed with large B-cell non-Hodgkin's lymphoma. The development of Plaintiff's non-Hodgkin Lymphoma was proximately and actually caused by exposure to Defendant's Roundup products.

111.    As a result of her injury, Plaintiff has incurred significant economic and non economic damages.


## CAUSES OF ACTION

### COUNT I
### PRODUCT LIABILITY – MPLA

112.    Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

113.    Plaintiff hereby asserts claims for design defect, failure to warn, breach of warranties and negligence pursuant to the Mississippi Product Liability Statute, MISS. CODE. ANN. § 11-1-63, and other applicable Mississippi law, against Monsanto and John Doe Defendants 1-5.

114.    At all times relevant to the Complaint, Defendants were in the business of designing, manufacturing, marketing, testing, labeling, selling and distributing Roundup.  The product at issue was defective and unreasonably dangerous at the time it left the hands of Defendants.  Defendants placed their product into the stream of commerce in a defective and unreasonably dangerous condition such that the foreseeable risks exceeded the benefits associated with the design of the product.

115.    Defendants' product was unreasonably and dangerously defective beyond the extent contemplated by ordinary users with ordinary knowledge regarding the product.  Plaintiff

was unaware of the danger as Defendants provided ineffective and inadequate warnings and instructions.

116.    Defendants' product was defective due to inadequate post-marketing warnings and instructions, and/or inadequate testing and studies, and/or inadequate reporting regarding the results.

117.    Defendants' product was defective in light of the dangers posed by its design and the likelihood of those avoidable dangers.  Defendants' product was defective because the inherent risk of harm in Defendants' product design outweighed the utility or benefits of the existing product design.  Defendants' product was defective because reasonably cost-effective and feasible state-of-the-art alternatives existed at the time that would not have undermined the product's usefulness.

118.    Defendants were aware of effective substitutes for the product.  The gravity and likelihood of the dangers posed by the product's design outweighed the feasibility, cost, and adverse consequences to the product's function of a safer alternative design that Defendants reasonably should have adopted.

119.    There was a safer alternative design that would have prevented or significantly reduced the risk of injury.  It was reasonable as well as economically and technologically feasible at the time the product left Defendants' control by the application of existing or reasonably achievable scientific knowledge.

120.    The defective and unreasonably dangerous conditions discussed herein existed when the product left Defendants' control.  Such defects existed when Defendants sold the product.  Such defects existed when Plaintiff received it.

121.     At all relevant times, Defendants knew or reasonably should have known that their product was unreasonably dangerous and defective when used as designed and directed.

122.     Defendants held themselves out as experts and specialists and therefore possessed a higher degree of skill and learning.

123.     Defendants had a duty to exercise reasonable care, and to comply with the then existing standard of care, in the design, testing, research, development, packaging, distribution, promotion, marketing, advertising, instruction, and sale of their product. Specifically:

(a)     Defendants had a continuing duty to ensure that the product they provided was safe and used correctly through proper design, testing, research, adequate instruction, post-market surveillance, and appropriate modifications;

(b)     Defendants had a duty to anticipate the environment in which the product would be used and to design against the reasonably foreseeable risks attending the product's use in that setting, including misuse or alteration;

(c)     Defendants had a continuing duty to give an adequate warning of known or reasonably foreseeable dangers arising from the use of their product;

(d)     Defendants had a duty to provide adequate warnings and instructions, which means they had to be comprehensible to the average user, calculated to convey the material risks to the mind of a reasonably prudent person, and of an intensity commensurate with the danger involved;

(e)     Defendants had a continuing duty to assure the product they provided was properly labeled and true to the representations Defendants made about it;

22

(f)     Defendants had a continuing duty to make sure their product had complete and accurate information and instructions concerning its proper use;

(g)     Defendants had a continuing duty to modify their products, and their packaging, instructions, promotional and advertising efforts to eliminate confusion and user error, assure compliance and prevent harm; and

(h)     Defendants had a continuing obligation to disseminate appropriate content and employ appropriate methods to convey accurate and complete product information.

124.    In violation of the existing standards and duties of care, Defendants, individually and collectively, deviated from reasonable and safe practices in the following ways, by:

(a)     designing a product defective in design and warnings/instructions;

(b)     failing to conduct pre and post market safety tests and studies;

(c)     failing to collect, analyze, and report available data regarding use of Defendants' product;

(d)     failing to conduct adequate post-market monitoring and surveillance;

(e)     failing to include adequate warnings and/or instructions;

(f)     failing to provide adequate warnings and/or proper instructions regarding proper uses of the product;

(g)     failing to inform users that Defendants had not adequately tested or researched the product to determine its safety and risks;

(h)     failing to educate and instruct users about the unique characteristics of their product and the proper way to use it;

23

(i)     failing to implement and execute corrective and preventive actions to eliminate injuries; and

(j)     continuing to promote and market the product despite the foregoing failures.

125.    Had Defendants designed a safe product and/or undertaken the tests, studies, and steps described herein, the injuries and damages complained of here would not have occurred.

126.    Defendants under-reported, underestimated, and downplayed the serious dangers of Roundup.

127.    Defendant negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

128.    Defendants were negligent and/or violated applicable law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that they:

(a)     Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

(b)     Failed to accompany its product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

(c)     Failed to accompany its product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

(d)     Failed to accompany its product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

(e)     Failed to warn Plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL;

(f)     Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;

(g)     Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

(h)     Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity; and

(i)     Were otherwise careless and/or negligent.

129.     Defendants also breached express warranties. Defendants represented and warranted to the Plaintiff that its Roundup products were safe for use in accordance with the Defendants' protocols. Said representations were in the form of marketing materials, product information and product materials provided to the Plaintiff and the public. Plaintiff justifiably relied on said representations and express warranties in electing to use said product.

130.     Roundup did not conform to Defendants' representations and warranties.

131.     At all relevant times, said product did not perform as safely as an ordinary consumer would expect when used as intended or in a reasonably foreseeable manner.

132.    At all relevant times, said product did not perform in accordance with the Defendants' representations.

133.    Defendants' product was not fit for the ordinary purpose for which such goods were used.  It was unmerchantable when used as directed and defective in design, and the Defendants' failure to provide adequate warnings and instructions also resulted in said product being unreasonably dangerous.  Defendants' product was dangerous to an extent beyond the expectations of ordinary consumers with common knowledge of the product's characteristics, including Plaintiff.

134.    The injuries and damages alleged herein were the reasonably foreseeable result of Defendants' product and conduct.

135.    Defendants are bound for the care of their agents, servants, employees, officers, and directors and for the neglect and/or fraud of the same.  Defendants are liable for the conduct of their agents, servants, employees, officers, and directors committed in the course of their activities on behalf of and in furtherance of the company.  Defendants are liable for their agents, employees, officers, and directors conduct attempting to advance Defendants' business.  Defendants expressly and impliedly authorized and ratified the conduct of their agents, servants, employees, officers, and directors.  Defendants received significant benefits as a direct result of their agents', employees', servants', officers', and directors' conduct.

136.    Defendants' conduct showed willful, malice, wantonness, oppression, or that entire want of care that raises the presumption of conscious indifference to consequences. Defendants' wrongdoing constitutes gross negligence, and said gross negligence proximately caused the injuries and the damages sustained by Plaintiff.

137.    As a direct and proximate result of Defendants' conduct and omissions described herein, Plaintiff developed non-Hodgkin's lymphoma and suffered the serious injuries and damages alleged in this Complaint.

## COUNT II
## NEGLIGENT MISREPRESENTATION & FRAUD

138.    Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

139.    Defendant Monsanto manufactures, designs, distributes, sells and/or supplies Roundup and, while engaged in the course of such business, made representations to the Plaintiff regarding the character and/or quality of Roundup, for guidance in the decision to select Roundup for use.

140.    Defendant Monsanto had a duty to disclose material information about serious health effects to consumers such as Plaintiff.  Defendant Monsanto intentionally failed to disclose this information for the purpose of inducing consumers, including Plaintiff, to purchase Defendant's dangerous products.

141.    Specifically, Defendant's advertisements regarding Roundup made material misrepresentations to the effect that Roundup was safe, which misrepresentations Defendant knew or should have known to be false, for the purpose of fraudulently inducing consumers, such as Plaintiff, to purchase said product.  Defendant further misrepresented that its products were just as safe, and just as effective or more effective, than other weed control products on the market.

142.    Defendant's representations regarding the character or quality of Roundup were

untrue. In addition, Defendant fraudulently suppressed material information regarding the safety of Roundup, including the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup and glyphosate.

143.    Defendant had actual knowledge based on the results of trials, tests, and studies of exposure to glyphosate, of the risk of serious harm associated with human use of and exposure to Roundup.

144.    Defendant negligently and or intentionally misrepresented or omitted this information in its product labeling, promotions and advertisements and instead labeled, promoted and advertised its products as safe and effective in order to avoid losses and sustain profits in its sales to consumers.

145.    In supplying the false information, Defendant failed to exercise reasonable care or competence in obtaining or communicating information to their intended recipients, including Plaintiff.

146.    Plaintiff, along with other consumers, reasonably relied to his or her detriment upon Defendant's misrepresentations and/or omissions in its labeling, advertisements, and promotions concerning the serious risks posed by the product.  Plaintiff, like other consumers, reasonably relied upon Defendant's representations that Roundup was safe for use and that Defendant's labeling, advertisements and promotions fully described all known risks of the product.

147.    Defendant is estopped from relying on any statute of limitations defenses because Defendant actively concealed the defects from consumers, such as Plaintiff.  Instead of revealing the defects, Defendant continued to represent its product as safe for its intended use.

148.    As a direct and proximate result of Plaintiff's use of Roundup as

manufactured, designed, sold, supplied and introduced into the stream of commerce by Defendant, Plaintiff suffered personal injury, non-economic damages, and will continue to suffer such harm and damages in the future.

## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

149.    Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

150.    The running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment through its affirmative misrepresentations and omissions, by which it actively concealed from Plaintiff the true risks associated with Roundup and glyphosate.

151.    At all relevant times, Defendant has maintained that Roundup is safe, non-toxic, and non-carcinogenic.

152.     Indeed, Defendant continues to represent to the public that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."

153.    As a result of Defendant's actions, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed Plaintiff to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

154.    Furthermore, Defendant is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality and nature of Roundup.

29

Defendant was under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Defendant had and continues to have exclusive control, and because Defendant knew that this information was not available to Plaintiff or to distributors of Roundup. In addition, Defendant is estopped from relying on any statute of limitations because of its intentional concealment of these facts.

155.    Plaintiff had no knowledge that Defendant was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendant, Plaintiff could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Defendant had the ability to and did spend enormous amounts of money in furtherance of its purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendant's representations. Accordingly, Defendant is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

## COMPENSATORY DAMAGES

156.    Plaintiff suffered serious injuries and damages as a direct and proximate result of the conduct and breaches of the Defendants, as aforesaid, for which compensation is required. Specifically, Defendants' products caused the Plaintiff to sustain Stage 3 non-Hodgkin's lymphoma, which was first diagnosed in the year 2018.

157.    Plaintiff has been forced to undergo extensive chemotherapy and other cancer treatments.  Plaintiff has suffered from early-onset menopause, shingles, extreme weakness and sickness as a result of the cancer treatment.  She was hospitalized on multiple occasions, requiring blood transfusions.

158.    Plaintiff has sustained many months of extreme pain and suffering, which will continue into the future.  Indeed, the 46-year-old Plaintiff will have to live with NHL for the rest of her life.  She will be forced to undergo ongoing monitoring and treatment throughout her life. Plaintiff is seeking monetary damages from the Defendants to compensate the Plaintiff for damages arising from the Defendants' product and wrongdoing, including all damages allowed pursuant to Mississippi law

159.    As a result of the aforementioned acts and/or omissions, Defendants are liable for all elements of damages, including but not limited to:

(a)    Damages for past doctor, hospital, drug, and medical bills;

(b)    Damages for future doctor, hospital, drug, medical bills, medical monitoring, life care plan and any other future costs and bills related to medical treatment;

(c)    Damages for disfigurement, impairment and disability;

(d)    Damages for past mental anguish and emotional distress;

(e)    Damages for physical pain and suffering;

(f)    Damages for loss of enjoyment of life;

(g)    Damages for reduced life expectancy;

(h)    Damages for loss of wages and wage earning capacity;

(i)     Damages for all other losses, both economic and intrinsic, tangible and intangible, sustained by the Plaintiff, all of which were proximately caused by the acts and/or omissions of the Defendants; and

(j)     Any other relief which the Court or jury deems just or appropriate based upon the circumstances.

160.    Plaintiff reserves the right to prove the amount of damages at trial.  The amount of compensatory damages will be in an amount to be determined by the jury.

## PUNITIVE DAMAGES

161.    As set forth herein above, Defendants' conduct exhibited gross negligence and a willful, wanton and reckless disregard for the safety of the Plaintiff and others, constituting an independent tort.  As a result of said conduct alleged herein, Defendants are liable for punitive damages and attorneys' fees, all litigation expenses and associated costs of litigation, pre-judgment interest and other damages pursuant to the Mississippi Punitive Damages Statute, MISS. CODE ANN. § 11-1-65.

162.    The conduct justifying an award of punitive damages includes, but is not limited to, the Defendants' willful, malicious, intentional and gross negligence, the fraudulent and/or negligent acts of misrepresentation and/or concealment, as well as other conduct described herein.  The amount of punitive damages to be awarded is an amount to be determined by the jury.

163.    Plaintiff prays that punitive or exemplary damages be assessed against the Defendants in an amount sufficient to punish the Defendants for their wrongful conduct and to deter like conduct in the future, and to serve as an example and a warning to others, so as to deter

others from engaging in a similar course of conduct and to encourage other companies to have due and proper regard for the rights and lives of consumers, and to protect the general public from future wrongdoing. Plaintiff prays that punitive damages be awarded in the appropriate amount to accomplish these purposes, taking into consideration the appropriate factors as set forth by Section 11-1-65 of the Mississippi Code Annotated and/or other law, including the degree of reprehensibility of the Defendants' conduct, harm likely to result from the Defendants' conduct, the duration of that conduct, the Defendants' awareness of the wrongfulness of such actions, and the Defendants' financial condition.

WHEREFORE, PREMISES CONSIDERED, Plaintiff sues and demands judgment from Defendants, Monsanto Company and John Doe Defendants 1-5, and respectfully requests an order from this Court awarding damages and compensation for the following:

1. An award of actual, consequential and incidental damages in such amounts as are sufficient to compensate in full Plaintiff for the losses and damages actually incurred as a result of the Defendants' defective product and wrongdoing;

2. An award of punitive damages in an amount adequate to deter the Defendants and serve as an example to deter similar conduct in the future;

3. An award of Plaintiff's costs and expenses incurred in connection with this action, including attorneys' fees, expert witness fees and all other costs herein;

4. An award of pre-judgment and post-judgment interest as the Court deems appropriate; an

33

5.      Granting such other and further relief as the Court deems just and proper,

including restitution, imposition of a constructive trust and/or such

extraordinary equitable or injunctive relief as permitted by law, equity or

statutory provisions as the Court deems proper to prevent unjust

enrichment of the Defendants and to provide the Plaintiff with an effective

remedy for the damages caused and injuries suffered as a result of the

Defendants' wrongdoing as aforesaid.

JURY TRIAL DEMANDED

Respectfully submitted, this the 2nd day of August, 2019.

ANITA DANCY

/s/ Jason L. Nabors
Jason L. Nabors, MSB #101630

JASON L. NABORS, MS BAR NO. 101630
NABORS LAW FIRM
P.O. Box 1334
Ridgeland, MS 39158
Telephone:  (601) 790-7270
Facsimile:  (601) 300-2975
Email:  jason@naborslawfirm.com

ROBERT A. MALOUF, MS BAR NO. 1844
601 Crescent Blvd., Suite 402
P.O. Box 199
Ridgeland, MS 39158
Telephone: 601-856-7392
Facsimile: 601-856-7396
Email: ramalo@aol.com

JOHN CALVIN PATTERSON, MS BAR NO. 103140
WESLEY D. EHRHARDT, MS BAR NO. 103021
PATTERSON | ERHARDT, PLLC
213 Main Street

PO Box 399
Como, MS 38619
(662) 526-1992
JCP@PattersonEhrhardt.com
wde@pattersonehrhardt.com